(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BECK, LIQUIDATING TRUSTEE OF ESTATES OF CROWN VANTAGE, INC., ET AL. *v.* PACE INTERNATIONAL UNION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 05–1448.   Argued April 24, 2007—Decided June 11, 2007

Respondent PACE International Union represented employees covered by single-employer defined-benefit pension plans sponsored and administered by Crown, which had filed for bankruptcy. Crown rejected the union's proposal to terminate the plans by merging them with the union's own multiemployer plan, opting instead for a standard termination through the purchase of annuities, which would allow Crown to retain a $5 million reversion after satisfying its obligations to plan participants and beneficiaries. The union and respondent plan participants (hereinafter, collectively, PACE) filed an adversary action in the Bankruptcy Court, alleging that Crown's directors had breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. §1001 *et seq.*, by neglecting to give diligent consideration to PACE's merger proposal. The court ruled for PACE, and petitioner bankruptcy trustee appealed to the District Court, which affirmed in relevant part, as did the Ninth Circuit. The Ninth Circuit acknowledged that the decision to terminate a pension plan is a business decision not subject to ERISA's fiduciary obligations, but reasoned that the implementation of a termination decision is fiduciary in nature. It then determined that merger was a permissible termination method and that Crown therefore had a fiduciary obligation to consider PACE's merger proposal seriously, which it had failed to do.

*Held:* Crown did not breach its fiduciary obligations in failing to consider PACE's merger proposal because merger is not a permissible form of plan termination under ERISA. Section §1341(b)(3)(A) pro-

vides: "In . . . any final distribution of assets pursuant to . . . standard
termination . . . , the plan administrator shall . . . (i) purchase irrevo-
cable commitments from an insurer to provide all benefit liabilities
under the plan, or . . . (ii) in accordance with the provisions of the
plan and any applicable regulations, otherwise fully provide all bene-
fit liabilities under the plan." The parties agree that clause (i) refers
to the purchase of annuities, and that clause (ii) allows for lump-sum
distributions. These are by far the most common distribution meth-
ods. To decide that merger is also a permissible method, the Court
would have to disagree with the Pension Benefit Guaranty Corpora-
tion (PBGC), the entity administering the federal insurance program
that protects plan benefits, which takes the position that
§1341(b)(3)(A) does *not* permit merger as a method of termination be-
cause merger is an *alternative* to (rather than an example of) plan
termination. The Court has traditionally deferred to the PBGC when
interpreting ERISA. Here, the Court believes that the PBGC's policy
is based upon a construction of the statute that is permissible, and
indeed the more plausible.

  PACE argues that §1341(b)(3)(A)(ii)'s residual provision referring to
an asset distribution that "*otherwise* fully provide[s] all benefit li-
abilities under the plan" covers merger because annuities (covered by
§1341(b)(3)(A)(i)) are an example of a permissible means of
"provid[ing] . . . benefit liabilities," and merger is the legal equivalent
of annuitization. Even assuming that PACE is right about the mean-
ing of the word "otherwise," the clarity necessary to disregard the
PBGC's considered views is lacking for three reasons. First, termi-
nating a plan through purchase of annuities formally severs ERISA's
applicability to plan assets and employer obligations, whereas merg-
ing the Crown plans into PACE's multiemployer plan would result in
the former plans' assets remaining *within* ERISA's purview, where
they could be used to satisfy the benefit liabilities of the multiem-
ployer plan's other participants and beneficiaries. Second, although
ERISA expressly allows the employer to (under certain circum-
stances) recoup surplus funds in a standard termination, §1344(d)(1),
(3), as Crown sought to do here, merger would preclude the receipt of
such funds by reason of §1103(c), which prohibits employers from
misappropriating plan assets for their own benefit. Third, merger is
nowhere mentioned in §1341, but is instead dealt with in an entirely
different set of statutory sections setting forth entirely different rules
and procedures, §§1058, 1411, and 1412. PACE's argument that the
procedural differences could be reconciled by requiring a plan sponsor
intending to use merger as a termination method to follow the rules for
both merger and termination is condemned by the confusion it would
engender and by the fact that it has no apparent basis in ERISA.

Syllabus

Even from a policy standpoint, the PBGC's construction of the statute is eminently reasonable because termination by merger could have detrimental consequences for the participants and beneficiaries of a single-employer plan, as well as for plan sponsors.  Pp. 4–14.

427 F. 3d 668, reversed and remanded.

SCALIA, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–1448

JEFFREY H. BECK, LIQUIDATING TRUSTEE OF THE ESTATES OF CROWN VANTAGE, INC. AND CROWN PAPER COMPANY, PETITIONER
*v.* PACE INTERNATIONAL UNION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 11, 2007]

JUSTICE SCALIA delivered the opinion of the Court.

We decide in this case whether an employer that sponsors and administers a single-employer defined-benefit pension plan has a fiduciary obligation under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.*, to consider a merger with a multiemployer plan as a method of terminating the plan.

I

Crown Paper and its parent entity, Crown Vantage (the two hereinafter referred to in the singular as Crown), employed 2,600 persons in seven paper mills. PACE International Union, a respondent here, represented employees covered by 17 of Crown's defined-benefit pension plans. A defined-benefit plan, "as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment." *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S. 152, 154 (1993). In such a plan, the employer generally shoulders the investment

risk. It is the employer who must make up for any deficits, but also the employer who enjoys the fruits (whether in the form of lower plan contributions or sometimes a reversion of assets) if plan investments perform beyond expectations. See *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 439–440 (1999). In this case, Crown served as both plan sponsor and plan administrator.

In March 2000, Crown filed for bankruptcy and proceeded to liquidate its assets. ERISA allows employers to terminate their pension plans voluntarily, see *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 638 (1990), and in the summer of 2001, Crown began to consider a "standard termination," a condition of which is that the terminated plans have sufficient assets to cover benefit liabilities. §1341(b)(1)(D); *id.,* at 638–639. Crown focused in particular on the possibility of a standard termination through purchase of annuities, one statutorily specified method of plan termination. See §1341(b)(3)(A)(i). PACE, however, had ideas of its own. It interjected itself into Crown's termination discussions and proposed that, rather than buy annuities, Crown instead merge the plans covering PACE union members with the PACE Industrial Union Management Pension Fund (PIUMPF), a multiemployer or "Taft-Hartley" plan. See §1002(37). Under the terms of the PACE-proposed agreement, Crown would be required to convey all plan assets to PIUMPF; PIUMPF would assume all plan liabilities.

Crown took PACE's merger offer under advisement. As it reviewed annuitization bids, however, it discovered that it had overfunded certain of its pension plans, so that purchasing annuities would allow it to retain a projected $5 million reversion for its creditors after satisfying its obligations to plan participants and beneficiaries. See §1344(d)(1) (providing for reversion upon plan termination where certain conditions are met). Under PACE's merger proposal, by contrast, the $5 million would go to PIUMPF.

What is more, the Pension Benefit Guaranty Corporation (PBGC), which administers an insurance program to protect plan benefits, agreed to withdraw the proofs of claim it had filed against Crown in the bankruptcy proceedings if Crown went ahead with an annuity purchase. Crown had evidently heard enough. It consolidated 12 of its pension plans[1] into a single plan, and terminated that plan through the purchase of an $84 million annuity. That annuity fully satisfied Crown's obligations to plan participants and beneficiaries and allowed Crown to reap the $5 million reversion in surplus funds.

PACE and two plan participants, also respondents here (we will refer to all respondents collectively as PACE), thereafter filed an adversary action against Crown in the Bankruptcy Court, alleging that Crown's directors had breached their fiduciary duties under ERISA by neglecting to give diligent consideration to PACE's merger proposal. The Bankruptcy Court sided with PACE. It found that the decision whether to purchase annuities or merge with PIUMPF was a fiduciary decision, and that Crown had breached its fiduciary obligations by giving insufficient study to the PIUMPF proposal. Rather than ordering Crown to cancel its annuity (which would have resulted in a substantial penalty payable to Crown's annuity provider), the Bankruptcy Court instead issued a preliminary injunction preventing Crown from obtaining the $5 million reversion. It subsequently approved a distribution of that reversion for the benefit of plan participants and beneficiaries, which distribution was stayed pending appeal.[2]

_____

[1] Crown's various other pension plans are not at issue in this case.

[2] PACE now suggests that it would have been willing to agree to a merger in which Crown kept its surplus funds. Brief for Respondents 17, n. 7. But this is belied not only by the terms of the proposed merger agreement, but by the fact that PACE actively sought and obtained a preliminary injunction freezing Crown's $5 million reversion. The Bankruptcy Court having rejected PACE's request to undo the annuity

Petitioner, the trustee of the Crown bankruptcy estates, appealed the Bankruptcy-Court decision to the District Court, which affirmed in relevant part, as did the Court of Appeals for the Ninth Circuit. The Ninth Circuit acknowledged that "the decision to terminate a pension plan is a business decision not subject to ERISA's fiduciary obligations," but reasoned that "the *implementation* of a decision to terminate" is fiduciary in nature. 427 F. 3d 668, 673 (2005). It then determined that merger was a permissible means of plan termination and that Crown therefore had a fiduciary obligation to consider PACE's merger proposal seriously, which it had failed to do. Petitioner thereafter sought rehearing in the Court of Appeals, this time with the support of the PBGC and the Department of Labor, who agreed with petitioner that the Ninth Circuit's judgment was in error. The Ninth Circuit held to its original decision, and we granted certiorari. 549 U. S. ___ (2007).

## II

Crown's operation of its defined-benefit pension plans placed it in dual roles as plan sponsor and plan administrator; an employer's fiduciary duties under ERISA are implicated only when it acts in the latter capacity. Which hat the employer is proverbially wearing depends upon the nature of the function performed, see *Hughes Aircraft Co., supra*, at 444, and is an inquiry that is aided by the common law of trusts which serves as ERISA's backdrop, see *Pegram* v. *Herdrich*, 530 U. S. 211, 224 (2000); *Lockheed Corp.* v. *Spink*, 517 U. S. 882, 890 (1996).

It is well established in this Court's cases that an em-

---

contract, PACE has provided no reason for pursuing this litigation other than to obtain the $5 million that remained after Crown satisfied its benefit commitments. Moreover, as PACE concedes, whether the parties would have agreed to a merger arrangement that did not include the $5 million is "speculation." Tr. of Oral Arg. 42.

ployer's decision *whether* to terminate an ERISA plan is a settlor function immune from ERISA's fiduciary obligations. See, *e.g.*, *ibid.*; *Curtiss-Wright Corp.* v. *Schoonejongen*, 514 U. S. 73, 78 (1995). And because "decision[s] regarding the form or structure" of a plan are generally settlor functions, *Hughes Aircraft Co.*, 525 U. S., at 444, PACE acknowledges that the decision to merge plans is "normally [a] plan sponsor decisio[n]" as well. Brief for Respondents 13, n. 5, 20–21; see also *Malia* v. *General Electric Co.*, 23 F. 3d 828, 833 (CA3 1994) (holding that employer's decision to merge plans "d[id] not invoke the fiduciary duty provisions of ERISA"). But PACE says that its proposed merger was different, because the PIUMPF merger represented a *method of terminating* the Crown plans. And just as ERISA imposed on Crown a fiduciary obligation in its selection of an appropriate annuity provider when terminating through annuities, see 29 CFR §§2509.95–1, 4041.28(c)(3) (2006), so too, PACE argues, did it require Crown to consider merger.

The idea that the decision whether to merge could switch from a settlor to a fiduciary function depending upon the context in which the merger proposal is raised is an odd one. But once it is realized that a merger is simply a transfer of assets and liabilities, PACE's argument becomes somewhat more plausible: The purchase of an annuity is akin to a transfer of assets and liabilities (to an insurance company), and if Crown was subject to fiduciary duties in selecting an annuity provider, why could it automatically disregard PIUMPF simply because PIUMPF happened to be a multiemployer plan rather than an insurer? There is, however, an antecedent question. In order to affirm the judgment below, we would have to conclude (as the Ninth Circuit did) that merger is, in the first place, a *permissible* form of plan termination under ERISA. That requires us to delve into the statute's provisions for plan termination.

ERISA sets forth the exclusive procedures for the standard termination of single-employer pension plans. §1341(a)(1); *Hughes Aircraft Co., supra,* at 446. Those procedures are exhaustive, setting detailed rules for, *inter alia*, notice by the plan to affected parties, §1341(a)(2), review by the PBGC, §1341(b)(2)(A), (C), and final distribution of plan funds, §1341(b)(2)(D), §1344. See generally E. Veal & E. Mackiewicz, Pension Plan Terminations 43–61 (2d ed. 1998) (hereinafter Veal & Mackiewicz). At issue in this case is §1341(b)(3)(A), the provision of ERISA setting forth the permissible *methods* of terminating a single-employer plan and distributing plan assets to participants and beneficiaries. Section 1341(b)(3)(A) provides as follows:

> "In connection with any final distribution of assets pursuant to the standard termination of the plan under this subsection, the plan administrator shall distribute the assets in accordance with section 1344 of this title. In distributing such assets, the plan administrator shall—
>
> "(i) purchase irrevocable commitments from an insurer to provide all benefit liabilities under the plan, or
>
> "(ii) in accordance with the provisions of the plan and any applicable regulations, otherwise fully provide all benefit liabilities under the plan. . . ."

The PBGC's regulations impose in substance the same requirements. See 29 CFR §4041.28(c)(1). Title 29 U. S. C. §1344, which is referred to in §1341(b)(3)(A), sets forth a specific order of priority for asset distribution, including (under certain circumstances) reversions of excess funds to the plan sponsor, see §1344(d)(1).

The parties to this case all agree that §1341(b)(3)(A)(i) refers to the purchase of annuities, see 29 CFR §4001.2 (defining "irrevocable commitment"), and that

§1341(b)(3)(A)(ii) allows for lump-sum distributions at present discounted value (including rollovers into individual retirement accounts). As PACE concedes, purchase of annuity contracts and lump-sum payments are "by far the most common distribution methods." Brief for Respondents 45; see also Veal & Mackiewicz 72–73 ("The basic alternatives are the purchase of annuity contracts or some form of lump-sum cashout"). To affirm the Ninth Circuit, we would have to decide that merger is a permissible method as well.[3] And we would have to do that over the objection of the PBGC, which (joined by the Department of Labor) disagrees with the Ninth Circuit, taking the position that §1341(b)(3)(A) does *not* permit merger as a method of termination because (in its view) merger is an *alternative* to (rather than an example of) plan termination. See Brief for United States as *Amicus Curiae* 8, 17–30. We have traditionally deferred to the PBGC when interpreting ERISA, for "to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to embar[k] upon a voyage without a compass." *Mead Corp.* v. *Tilley*, 490 U. S. 714, 722, 725–726 (1989) (internal quotation marks omitted); see also *LTV Corp.*, 496 U. S., at 648, 651. In reviewing the judgment below, we thus must examine "whether the

_____

[3] We would not have to decide that question of statutory interpretation if Crown's pension plans disallowed merger. Any method of termination permitted by §1341(b)(3)(A)(ii) must also be one that is "in accordance with the provisions of the plan." Crown thus could have drafted its plan documents to limit the available methods of termination, so that merger was not permitted. Petitioner argued below that Crown had done just that. Though the District Court concluded that the plan terms allowed for merger, App. to Pet. for Cert. 47, the Ninth Circuit declined to consider the plan language because it held that petitioner had failed to preserve the argument in the Bankruptcy Court. Petitioner did not seek certiorari on the factbound issues of waiver and plan interpretation, and we accordingly do not address them here.

PBGC's policy is based upon a permissible construction of the statute." *Id.,* at 648.[4]

We believe it is. PACE has "failed to persuade us that the PBGC's views are unreasonable," *Mead Corp., supra*, at 725. At the outset, it must be acknowledged that the statute, with its general residual clause in §1341(b)(3)(A)(ii), is potentially more embracing of alternative methods of plan termination (whatever they may be) than longstanding ERISA practice, which appears to have employed almost exclusively annuities and lump-sum payments. But we think that the statutory text need not be read to include mergers, and indeed that the PBGC offers the better reading in excluding them. Most obviously, Congress nowhere expressly provided for merger as a permissible means of termination. Merger is not mentioned in §1341(b)(3)(A), much less in any of §1341's many subsections. Indeed, merger is expressly provided for in an entirely separate set of statutory sections (of which more in a moment, see *infra*, at 11–13). PACE neverthe-

---

[4] PACE argues that the PBGC took an inconsistent approach in several opinion letters from the 1980's concerning the applicability of certain joint guidelines for asset reversions during complex termination transactions. See App. to Brief in Opposition 6a–9a (Opinion Letter 85–11 (May 14, 1985)); *id.,* at 10a–13a (Opinion Letter 85–21 (Aug. 26, 1985)); *id.,* at 14a–16a (Opinion Letter 85–25 (Oct. 11, 1985)). But insofar as the PBGC's consistency is even relevant to whether we should accord deference to its presently held views, none of those letters so much as hints that the PBGC treated merger as a permissible form of plan termination. In fact, to the extent they even speak to the question, they clearly show the opposite. In Opinion Letter 85–25, for example, the PBGC explained that the joint guidelines for asset reversions did not apply to "a transfer [of assets and liabilities] from a single-employer plan to an ongoing multiemployer plan *followed by* the termination of the single-employer plan." App. to Brief in Opposition 15a (emphasis added). By characterizing the proposed transaction as one that took place in two separate steps (merger *and then* termination), this letter fully contemplated that merger was *not* an *example of* plan termination.

less maintains that merger is clearly covered under §1341(b)(3)(A)(ii)'s residual clause, which refers to a distribution of assets that "otherwise fully provide[s] all benefit liabilities under the plan." By PACE's reasoning, annuities are covered under §1341(b)(3)(A)(i); annuities are—by virtue of the word "otherwise"—an *example* of a means by which a plan may "fully provide all benefit liabilities under the plan," §1341(b)(3)(A)(ii); and therefore, "at the least," any method of termination that is the "legal equivalent" of annuitization is permitted, Brief for Respondents 23. Merger, PACE argues, is such a legal equivalent.

We do not find the statute so clear. Even assuming that PACE is right about "otherwise"—that the word indicates that annuities are *one example* of satisfying the residual clause in §1341(b)(3)(A)(ii)—we still do not find mergers covered with the clarity necessary to disregard the PBGC's considered views. Surely the phrase "otherwise fully provide all benefit liabilities under the plan" is not without some teeth. And we think it would be reasonable for the PBGC to determine both that merger is not like the purchase of annuities in its ability to "fully provide all benefit liabilities under the plan," and that the statute's distinct treatment of merger and termination provides clear evidence that one is not an example of the other. Three points strike us as especially persuasive in these regards.

First, terminating a plan through purchase of annuities (like terminating through distribution of lump-sum payments) formally severs the applicability of ERISA to plan assets and employer obligations. Upon purchasing annuities, the employer is no longer subject to ERISA's multitudinous requirements, such as (to name just one) payment of insurance premiums to the PBGC, §1307(a). And the PBGC is likewise no longer liable for the deficiency in the event that the plan becomes insolvent; there *are* no more

benefits for it to guarantee. The assets of the plan are wholly removed from the ERISA system, and plan participants and beneficiaries must rely primarily (if not exclusively) on state-contract remedies if they do not receive proper payments or are otherwise denied access to their funds. Further, from the standpoint of the participants and beneficiaries, the risk associated with an annuity relates solely to the solvency of an insurance company, and not the performance of the merged plan's investments.

Merger is fundamentally different: it represents a *continuation* rather than a *cessation* of the ERISA regime. If Crown were to have merged its pension plans into PIUMPF, the plan assets would have been combined with the assets of the multiemployer plan, where they could then be used to satisfy the benefit liabilities of participants and beneficiaries *other than* those from the original Crown plans. Those assets would remain *within* ERISA's purview, the PBGC would maintain responsibility for them, and if Crown continued to employ the plan participants it too would remain subject to ERISA. Finally, plan participants and beneficiaries would have their recourse not through state-contract law, but through the ERISA system, just as they had prior to merger.

Second, in a standard termination ERISA allows the employer to (under certain circumstances) recoup surplus funds, §1344(d)(1), (3), as Crown sought to do here. But ERISA forbids employers to obtain a reversion *in the absence of a termination:* "A valid plan termination is a prerequisite to a reversion of surplus plan assets to an employer." App. to Brief in Opposition 15a (PBGC Opinion Letter 85–25 (Oct. 11, 1985); see also Veal & Mackiewicz 164–165. Crown could not simply extract the $5 million surplus from its plans, nor could it have done so once those assets had transferred to PIUMPF. This would have run up against ERISA's anti-inurement provision, which prohibits employers from misappropriating plan

assets for their own benefit.  See §1103(c).  Consequently, we think the PBGC was entirely reasonable in declining to recognize as a form of termination a mechanism that would preclude the receipt of surplus funds, which is specifically authorized upon termination.[5]

Third, the structure of ERISA amply (if not conclusively) supports the conclusion that §1341(b)(3)(A)(ii) does not cover merger.  As noted above, merger is nowhere mentioned in §1341, and is instead dealt with in an entirely different set of statutory sections setting forth entirely different rules and procedures.  Compare §1058 (general merger provision), §1411 (mergers between multiemployer plans), and §1412 (mergers between multiemployer and single-employer plans) with §1341 (termination of single-employer plans), §1341a (termination of multiemployer plans); see generally Veal & Mackiewicz 31–40 (describing merger as an alternative to plan termination).  Section 1058, the general merger provision, in fact quite clearly contemplates that merger and termination are not one and the same, forbidding merger "unless each participant in the plan would *(if the plan then terminated)* receive a benefit immediately after the merger . . . which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger . . . *(if the plan had*

_____

[5] This inability to recover surplus funds through a merger could not be remedied, as PACE now suggests, by structuring the transaction so that Crown provided to PIUMPF only assets sufficient to cover plan liabilities (effectively creating a spinoff from Crown's plans and merging that spinoff plan with PIUMPF).  Under that arrangement, Crown could indeed obtain the $5 million reversion—not, however, by reason of the merger-called-termination, but only by subsequent termination of the *residual* plan.  See, *e.g.*, App. to Brief in Opposition 14a–16a (PBGC Opinion Letter 85–25 (Oct. 11, 1985)) (describing such a sequence of transactions).  This falls short of rendering the *merger* a termination permitting recovery of surplus funds.  That a transfer of assets can occur in anticipation of a future termination does not render that transfer itself a termination.

*then terminated).*" (Emphasis added.)

As for the different rules and procedures governing termination and merger: Most critically, plans seeking to terminate must provide advance notice to the PBGC, as well as extensive actuarial information. §1341(b)(2)(A). The PBGC has the authority to halt the termination if it determines that plan assets are insufficient to cover plan liabilities. §1341(b)(2)(C). Merger, by contrast, involves considerably less PBGC oversight, and the PBGC has no similar ability to cancel, see Brief for United States as *Amicus Curiae* 24. And the rules governing notice to the PBGC are either different or nonexistent. Section 1412, the provision governing merger between a single and multiemployer plan (the form of merger contemplated by PACE's proposal) makes no mention of early notice to the PBGC. And while mergers between multiemployer plans do require 120-days advance notice, §1411(b)(1), this still differs from the general notice provision for termination of single-employer plans, which requires notice to the PBGC "[a]s soon as practicable" after notice is given to affected parties, §1341(b)(2)(A). Relatedly, §1341(a)(2) also requires that, in a standard termination, written notice to plan participants and beneficiaries include "any related additional information required in regulations of the [PBGC]." Those regulations require, among other things, that the plan inform participants and beneficiaries that upon distribution, "the PBGC no longer guarantees . . . plan benefits." 29 CFR §4041.23(b)(9). (This requirement of course has no relevance to a merger, because after a merger the PBGC *continues* to guarantee plan benefits.)

PACE believes that these procedural differences can be ironed over rather easily. It insists:

> "Many plan mergers take place without intent to terminate a plan; in those cases, the requirements for plan merger can be followed without consulting the

requirements for plan termination.  Conversely, many plan terminations take place without an associated merger; in those cases there is no need to consult the requirements for mergers.  But if a plan sponsor intends to use merger as a method of implementing a plan termination, it simply must follow the rules for both merger and termination."  Brief for Respondents 36.

PACE similarly explains that while the PBGC does not approve "ordinary merger[s]," PBGC approval would be necessary when a merger is designed to terminate a plan. *Id.,* at 37.  The confusion invited by PACE's proposed framework is alone enough to condemn it.  How could a plan be sure that it was in one box rather than the other?  To avoid the risk of liability, should it simply follow both sets of rules all of the time?  PACE's proposal is flawed for another reason as well: It has no apparent basis in the statute.  The separate provisions governing termination and merger quite clearly treat the two as wholly different transactions, with no exception for the case where merger is used for termination.

For all of the foregoing reasons, we believe that the PBGC's construction of the statute is a permissible one, and indeed the more plausible.  Crown did not breach its fiduciary obligations in failing to consider PACE's merger proposal because merger is not a permissible form of termination.  Even from a policy standpoint, the PBGC's choice is an eminently reasonable one, since termination by merger could have detrimental consequences for plan beneficiaries and plan sponsors alike.  When a single-employer plan is merged into a multiemployer plan, the original participants and beneficiaries become dependent upon the financial well-being of the multiemployer plan and its contributing members.  Assets of the single-employer plan (which in this case were capable of fully

funding plan liabilities) may be used to satisfy commit-ments owed to *other* participants and beneficiaries of the (possibly underfunded) multiemployer plan. The PBGC believes that this arrangement creates added risk for participants and beneficiaries of the original plan, particu-larly in view of the lesser guarantees that the PBGC provides to multiemployer plans, compare §1322 with §1322a. See Brief for United States as *Amicus Curiae* 29, and n. 11. For employers, the ill effects are demonstrated by the facts of this very case: by diligently funding its pension plans, Crown became the bait for a union bent on obtaining a surplus that was rightfully Crown's. All this after Crown purchased an annuity that none dispute was sufficient to satisfy its commitments to plan participants and beneficiaries.

*      *      *

We hold that merger is not a permissible method of terminating a single-employer defined-benefit pension plan. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consis-tent with this opinion.

*It is so ordered.*